UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARIA F. TAVARES,              )
                              )
            Plaintiff,         )    CIVIL ACTION NO.
                              )    11-10153-DPW
v.                             )
                              )
MICHAEL J. ASTRUE,             )
Commissioner of Social         )
Security,                      )
                              )
            Defendant.         )
                              )

MEMORANDUM AND ORDER
February 28, 2012

Maria Tavares appeals the final decision of the Commissioner
of the Social Security Administration (the "Commissioner"),
denying her Social Security Disability Insurance benefits
("SSDI") and Supplemental Security Income benefits ("SSI").  The
Commissioner has moved for an order affirming his decision, and
Tavares has moved for an order reversing that decision.  After
consideration of the entire record, which I find provides
substantial evidence for the denial, I will affirm the
Commissioner's decision.

**I.  BACKGROUND**

A.  Basic Facts

Tavares was forty-six years old when she claims she became
disabled.  At the time of her application, she was forty-eight.
She completed fifth grade while living in Portugal, and then

obtained her GED in 1987.  She acquired a real estate license and primarily worked as an assistant real estate property manager until the time of her alleged disability.

B.   Medical History

    1.  *Physical Impairments*

    Tavares has complained of neck and back pain, fibromyalgia, Hashimoto's thyroiditis, and arthritis at various points over a number of years.  She first complained of mid-upper back pain in 1999 to Dr. Le.  The record shows that she next complained of neck and back pain in 2008 to Dr. Hangen, an orthopedist. Tavares thought that the pain stemmed from a car accident she was involved in sometime between fifteen and twenty years prior.  Dr. Hangen noted that Tavares had diffuse tenderness in her neck and back, but that her range of motion was quite good and she did not have any specific tender points or spasms.  After obtaining x-rays, Dr. Hangen thought that Tavares had good alignment and disc spaces, with no fractures or specific degenerative changes noted in her spine.  Thus, Dr. Hangen opined that the problem was largely soft-tissue related, and prescribed physical therapy.

    On September 4, 2008, Tavares went to see Dr. Nelson because she complained that her heart was beating too fast.  Dr. Nelson thought that her episodes of tachycardia could be a function of her anxiety and stress, and ordered a 48-hour monitor of her

heart as well as an echocardiogram.  On October 1, 2008, Dr.
Nelson wrote that Tavares's echocardiogram was very reassuring
and that the 48-hour monitor did not reveal any significant
arrhythmias.  Tavares told Dr. Nelson that during the 48-hour
period, she had not experienced any of her symptoms and thought
that they were related to her anxiety, which had subsided
somewhat along with the symptoms of her heart racing.

On October 20, 2008, Dr. Trockman completed a residual
functional capacity ("RFC") assessment of Tavares's physical
limitations.  She opined that Tavares could occasionally lift 20
pounds; frequently lift 10 pounds; stand 6 hours in an 8-hour
workday; and sit 6 hours in an 8-hour workday.  AR 404.  She
noted that Tavares made simple meals for herself, performed
household chores, drove a vehicle, and went out alone to shop.
Dr. Trockman found that Tavares's statements regarding her
difficulty with lifting and prolonged walking were credible.  She
thought that Tavares was limited in her ability to reach
overhead, but could frequently balance, kneel and crawl, and
occasionally climb, stoop, and crouch.

Pursuant to a request from the Massachusetts Rehabilitation
Commission, on July 7, 2009 Dr. Komer examined Tavares.  Tavares
complained of chronic anxiety and depression, and pain in the
left scapular and cervical regions.  Dr. Komer examined Tavares's
mid-back region, but discovered no localized tenderness and only

minimal tenderness at the C4-C7 region.  Tavares had no deformity
of the scapula and her handgrip was normal, but she had slightly
decreased movement of the spine with flexion of thirty-degrees
and extension of twenty-degrees.  With regard to Tavares's
complaints of shoulder pain, Dr. Komer thought that Tavares had
cervical spondylosis.

On July 13, 2009, Dr. Kriston completed a second RFC for the
Commissioner.  She opined, as Dr. Trockman had, that Tavares
could occasionally lift 20 pounds; frequently lift 10 pounds;
stand about 6 hours in an 8-hour workday; and sit about 6 hours
in an 8-hour workday.  Dr. Kriston thought Tavares could
frequently balance and kneel, and occasionally climb, stoop,
crouch, and crawl.  Dr. Kriston reported that Tavares's ability
to reach overhead was limited, but otherwise thought that Tavares
had no other limitations.

On October 27, 2009, Tavares saw Dr. Mathur, a
rheumatologist, complaining of pain in the neck, elbow, and
shoulder regions.  Dr. Mathur examined Tavares and noted diffuse
tender points and mild crepitus without effusion in her knees.
Dr. Mathur opined that Tavares's diffuse pains could be secondary
to fibromyalgia.  Tavares told Dr. Mathur that she was depressed
at times, and Dr. Mathur thought that could be contributing to
her pain.

4

On January 14, 2010, Tavares returned to Dr. Mathur complaining of "persistent pains, which are widespread and distributed in both upper and lower halves of the body" despite taking non-steroidal anti-inflammatory drugs.  Dr. Mathur continued to think that Tavares's symptoms were "most likely secondary to fibromyalgia," and opined that Tavares also had osteoarthritis.

Tavares also was seen by Dr. Punjabi in January of 2010 regarding her history of Hashimoto's thyroiditis.  Dr. Punjabi examined Tavares and concluded she had hypothyroidism.  Dr. Punjabi advised Tavares to remain on the medication that had been prescribed for her condition.

*2.   Mental Impairments*

In 1994, Tavares complained of depression to her primary care physician, Dr. Le.  She stated that she was fatigued and felt extremely apathetic such that she did not want to get out of bed most mornings.  She noted that she continued to have marital problems and was drinking to help get herself through the day.  Dr. Le thought that Tavares was depressed, and started her on Zoloft.

Over the next eight years, Tavares was prescribed Zoloft, Prozac, and other anti-depressants.  She divorced her husband in 2002, and for awhile expressed that she was feeling better.  She

then remarried, but again divorced in 2006 after her second
husband was abusive while they lived in Brazil from 2004-2006.

Upon returning to work in 2006 at her old job, Tavares
experienced anxiety and fear and could not bring herself to meet
with her tenants.  Whenever she would have a meeting schedule
with a tenant, she would close her door and hide.  Tavares only
lasted between two and three months at her old job before she had
to quit.

In 2008, Tavares began treatment at Advocates, Inc.
("Advocates"), a community mental health center in Marlboro,
Massachusetts.  On September 3, 2008, Dr. Cherney—a physician
with Advocates—filled out an Emergency Aid to the Elderly,
Disabled and Children Medical Report for the Massachusetts
Department of Transitional Assistance.  In that report, Dr.
Cherney diagnosed Tavares with major depressive disorder, PTSD,
and anxiety.  Tavares reported experiencing sleep deficits,
frequent and unexpected panic attacks, and severe anxiety when
leaving the house and interacting with others.  Dr. Cherney
opined that Tavares's ability to understand, remember,
concentrate and persist were significantly impaired by her
ailments, and that she was unable to socialize.

Tavares received treatment at Advocates from Jennifer
Crawford, a clinician, in late 2008 and into 2009.  In September
and October 2008, Crawford met with Tavares, who described

feeling fearful and incapable of action.  Crawford thought that
Tavares needed to develop strategies to control her fears so she
can leave the house and work.  For example, while Tavares was
anxious and described a tightness in her chest and stomach, her
symptoms went away when she implemented relaxation skills.
Tavares reported that some of the exercises Crawford had her
perform were "wonderful."  Crawford planned to meet with Tavares
twice a week for relaxation training and trauma re-processing to
help her work through her anxiety and fears.  Crawford suggested
that Tavares improve her coping skills so she could return to
work.

On December 3, 2008, Dr. Collins-Wooley, a state agency
physician, completed a Psychiatric Review Technique of Tavares.
Dr. Collins-Wooley thought that Tavares's impairments were
severe, but would not last more than 12 months.  Dr. Collins-
Wooley thought that Tavares experienced moderate restrictions of
her daily living activities; moderate difficulty in maintaining
social functioning and concentration, persistence, or pace; but
did not experience any episodes of decompensation.  Dr. Collins-
Wooley also projected that each of those restrictions and
difficulties would be only mild by May 2009.

Throughout her time receiving counseling at Advocates,
Tavares experienced some improvement in her depression, but then
an event of some sort would trigger a setback.  For example, on

April 14, 2009, Tavares reported that some of her symptoms had
worsened over time, but that she was currently experiencing
increased confidence from cooking and the birth of her new
granddaughter.  Crawford noted that Tavares appeared happy and
euthymic, but became tearful due to some of the content of their
counseling meeting.  Two weeks later, on April 27, 2009, Tavares
presented as very distressed because she discovered that the male
relative she was renting a room from had been going into her
bedroom to sniff her undergarments while she was away.  This
prompted Tavares to disclose a memory of being molested by an
uncle at the age of 7.  The following week, on May 4, 2009,
Tavares reported she had recently moved in with one of her
sisters and felt that she was in a safe place.  Her increased
depression did not prevent her from coordinating resources for
herself, which gave her a sense of accomplishment.

Dr. Cherney completed a psychiatric disorder form for
Tavares on May 22, 2009.  He stated that Tavares struggled with
persistent crying, anxiety problems, and insomnia, and had been
unable to function in a work environment.  Dr. Cherney observed
that Tavares had difficulty forming and sustaining relationships
due to fears and mistrust, and she often had difficulty leaving
the house or interacting with others and felt helpless and lacked
energy.  However, he also noted that Tavares was able to complete
all activities of daily living, and gave her a GAF score of 52,

which indicates moderate symptoms, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).  Dr. Cherney also thought that Tavares would be able to handle her own benefits if they were awarded.

By June 1, Tavares still appeared anxious but reported feeling less isolated since moving in with her sister.  Tavares said she was able to leave the house to go for walks with her sister daily.  She found prayer helpful to cope with feelings of helplessness.  One week later, Tavares reported that her new depression medication was helping.  On June 15, 2009, Dr. McKenna completed a Psychiatric Review Technique of Tavares.  She opined that Tavares had moderate restrictions on her activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.

Dr. McKenna also completed a mental RFC assessment of Tavares.  Dr. McKenna thought that Tavares was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public transportation.  In all other

respects, Dr. McKenna thought that Tavares was not significantly limited.

Dr. McKenna thought that Tavares was able to comprehend and recall simple information, complete simple tasks within her physical limitations, and sustain that effort for two hour increments across an eight-hour day. She noted that Tavares's motivation was low, and that Tavares's social avoidance and trauma memories can interfere at times with her memory.

On June 22, 2009, Crawford noted that Tavares reported feeling frustrated with her lack of progress. Crawford reminded Tavares that she was making progress being more socially and physically active. The following week, Tavares remained frustrated and overwhelmed, but by July 6 was feeling optimistic, relaxed and proud for having driven the entire way to the beach. Crawford discussed the idea of going back to work, and Tavares agreed that it would be a good idea to start with volunteer work. One week later, however, Tavares returned to Crawford feeling angry, helpless, and depressed at her situation after her divorce.

In July and early August, 2009, Crawford and Tavares practiced meditation exercises that Tavares enjoyed and continued to practice on her own. However, her anxiety and depression continued to increase, and Tavares had difficulty following

through with Crawford's recommendations on how to deal with her
anxiety and stress.

On August 24, 2009, Crawford assessed that Tavares had a GAF
score of 55, the highest GAF she had achieved in the past year,
indicating that she had moderate symptoms. *Diagnostic and
Statistical Manual of Mental Disorders* 34 (4th ed. 2000).

One month later, on September 15, Crawford and Dr. Granot, a
physician with Advocates, completed a Psychiatric Review
Technique of Tavares.  They noted that Tavares experienced
persistent crying, extreme and persistent feelings of
hopelessness and worthlessness, multiple somatic symptoms due to
anxiety, fear and avoidance of many daily tasks and situations
due to anxiety symptoms, flashbacks and frequent nightmares, and
had a low level of daily activity or functioning.  They opined
that Tavares had marked restrictions on her activities of daily
living; marked difficulty maintaining social functioning;
frequent deficiencies of concentration, persistence or pace
resulting in failure to complete tasks in a timely manner; and
repeated episodes of deterioration or decompensation.  Crawford
and Dr. Granot also thought that Tavares's symptoms resulted in
her complete inability to function independently outside of her
home.

Two weeks later, however, on October 5, 2009, Tavares
reported to Crawford that she was engaged in medical self-

11

advocacy, following through with doctors appointments and researching medical issues in the library.  Tavares felt good about being able to perform these functions.  Things briefly took a turn for the worse in November, when Tavares had to leave the place she was living and experienced an interruption in her transitional assistance benefits, but Crawford noted that Tavares remained proud of herself for following up on appointments to get her assistance back, rather than avoiding them as she had previously done.  In November, Tavares continued to improve slightly, and was able to inquire about volunteering at the senior center, which Crawford recognized as "a big achievement for" Tavares.  Tavares became anxious around the holidays, but was also hopeful for the future; she talked with Crawford about renewing her real estate license and told Crawford she was looking into a part-time job.

On December 22, 2009, Dr. Granot opined that Tavares had a GAF of 65, AR 575, which indicates mild symptoms with only slight impairment in functioning.  *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).  At that time, Dr. Granot observed that Tavares was in a better mood, and Tavares felt like she was finally rightly diagnosed.  A few months later, on February 9, 2010, Tavares reported to Dr. Granot that she was not

sleeping well, but Dr. Granot again reported that Tavares was in a better mood and had a GAF of 65.[1]

Throughout the spring of 2010, Tavares continued to make small improvements after minor setbacks.  For example, while she felt anxious and stressed about her friend whom she lives with getting a pitbull, Tavares was able to calm down and became friendly with the dog.  AR 584.  On May 3, 2010, Crawford reported that Tavares was walking daily, was using coping skills she had learned in therapy, and was babysitting her grandchildren two times per week.  Tavares told Crawford she was enjoying babysitting very much, and she did not feel her physical pain when she was babysitting, though she still was getting anxious the day and night before she was scheduled to babysit.  On May 17, 2010, Tavares reported that she had joined a gym and expressed renewed interest in finding a support group to join.

---

[1]  It is uncertain whether Dr. Granot's notes from the February 9, 2010 visit are independently derived.  Dr. Granot's notes are nearly identical to his December 22 notes, including the same misspellings of attic ("attick") and helpful ("helpfull"), but include the additional notation that Tavares was not sleeping well and was taking clonazepam at night.  *Compare* AR 574 ("generally not sleeping well, takes up to 2 mg of clonazepam at night because not able to sleep.  Moved again, now living a friend in Hudson, this a woman friend this is a good arrangement.  Her son is her god child and lives with them too.  She and her son fight a lot.  Lives in the attick.  She appears to be in a better mood, takes the right dose of Thyroid medication.  This is helpfull."), *with* AR 575 ("Moved again, now living a friend in Hudson, this a woman friend this is a good arrangement.  Her son is her god child and lives with them too.  She and her son fight a lot.  Lives in the attick.  She appears to be in a better mood, takes the right dose of Thyroid medication.  This is helpfull.").

On May 27, 2010, Tavares stated that she felt better and was able to talk to people in a fibromyalgia support group about her problems.  She told Crawford that she planned on going to the support group meeting the following week, and that she had been able to answer the phone and drive herself to her appointments rather than feel anxious.

On July 7, 2010, Crawford filled out a Medical Source Statement for Tavares that was co-signed by Dr. Granot.  Although Tavares had been expressing improvements as recently as the spring of 2010, Crawford opined in her Statement that Tavares had experienced an extreme loss of her ability to understand, remember, and carry out detailed instructions; work in coordination with or proximity to others; make simple work-related decision; complete a normal workday or workweek without interruptions from psychologically based symptoms; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; travel in unfamiliar places; and use public transportation.  She also noted that Tavares had experienced a marked loss in her ability to understand, remember, and carry out very short simple instructions; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; get along with coworkers and peers without unduly distracting them; respond appropriately to

changes in a routine work setting; and set realistic goals or
make plans independently of others.  Crawford thought Tavares was
moderately limited in her ability to maintain regular attendance
and be punctual; sustain an ordinary routine without special
supervision; and maintain socially appropriate behavior.

Ultimately, Crawford concluded in her Statement that Tavares
was markedly limited in her activities of a daily living;
experienced marked difficulties in maintaining social
functioning; frequently experienced deficiencies in
concentration, persistence, or pace resulting in failure to
complete tasks in a timely manner; and had continual episodes of
deterioration or decompensation in work or work-like settings.
Nevertheless, Crawford thought that Tavares had a GAF score of
58, or moderate symptoms.  *Diagnostic and Statistical Manual of
Mental Disorders* 34 (4th ed. 2000).

C.   Procedural History

1.   *Application for SSDI and SSI*

Tavares filed her claims for SSI on September 1, 2008, and
for SSDI on September 16, 2008.  She claimed that she become
disabled on November 30, 2006 due to depression, anxiety, and
neck problems.  At the time when she claimed to have become
disabled, she was insured.[2]  Tavares stated in her application

---

[2]  To be eligible for SSDI, Tavares must show that she was
insured for disability at the time she became disabled.  Under
the regulations, she must show that she was fully insured and had

that she could prepare meals, clean her room, do laundry, travel
to appointments, go grocery shopping, drive, handle her finances,
watch TV, visit with family members, and babysit her
grandchildren.

Her claim was initially denied on December 4, 2008.  Her
claim was again denied on July 14, 2009.  On September 8, 2009,
Tavares filed a request for a hearing.

2.   *The ALJ's Hearing*

On August 12, 2010, the ALJ held a hearing at which Tavares
and a vocational expert testified.

i.   Tavares

Tavares testified that she used to work as a real estate
property manager, and was in charge of one apartment complex.
She noted that she started to become anxious and depressed after
her mother died in 1992, but it was only when her first and
second husbands were abusive towards her that she had problems
working through the anxiety and depression.  In 2004, she moved
to Brazil with her second husband, who abused her.  In 2006,
Tavares left her husband and fled to the United States, where she
tried to start working again at her old job.  However, she found
herself unable to do her job effectively, because she would get

_____

"at least 20 [quarters of coverage] in the 40-quarter period"
leading up to the quarter in which he became disabled.  20 C.F.R.
§ 404.130(b).

afraid and anxious and could not meet with tenants without experiencing intense fear.

Tavares testified that her depression; anxiety; back and neck problems; and pain in her hands, knees, legs, and arms prevent her from working.  She also testified that she has osteoarthritis, a thyroid condition, and gastritis resulting from nervousness.  Tavares's attorney elicited testimony from Tavares that she has trouble sleeping, and that sleeping medications have not helped.

Tavares told the ALJ that between 2006 and the time of her hearing, she had gained more than 40 pounds from overeating due to depression.  She testified that while she was able to shower and get dressed, she didn't take care of herself like she used to and would sometimes stay in pajamas all day.  She did her own laundry, and would occasionally boil eggs or make toast, but her sister liked to cook and would often bring her meals.  Social interactions, visitors, and telephone calls would make her anxious, so Tavares often avoided them if she could.

Tavares also testified that she had memory-loss issues; she could not remember events that other people told her had happened.  Her anxiety she said also caused her to have panic attacks, marked by a feeling that she was going to have a heart attack, profuse sweating, and inability to concentrate.  Tavares said she would have a panic attack almost every time she left her

house.   Tavares also noted that her hair was falling out, which a dermatologist attributed to stress.

Tavares then described for the ALJ her daily routine.  She stated that she would wake up early (between four and seven a.m.), have coffee and toast, and watch TV.  She would then go to any doctors appointments she had that day, or go food shopping with her sister, which she would do once a week.

ii.  Vocational Expert

The ALJ then posed a hypothetical to the vocational expert ("VE"), Mr. Goodman.  The ALJ's hypothetical contained all of Tavares's RFC limitations that the ALJ ultimately found.  The VE testified that with those restrictions, the hypothetical individual could not perform Tavares's past work.  However, the VE testified that the hypothetical individual could perform jobs like a packing line worker, DOT Code 753.687-038, or press operator, DOT Code 715.685-050.  There are 777,000 packing line worker jobs nationally, and 17,000 in Massachusetts, and 242,000 press operator jobs available nation-wide, with 3,100 in Massachusetts.

The VE also testified, however, that if the hypothetical individual could not maintain concentration, persistence, or pace for two-hour periods over an eight-hour day, that the individual would not be able to perform any jobs in the national or state-wide economies.  Likewise, if the person had a marked loss in

understanding, remembering, or carrying out short and simple
instructions; an extreme loss in understanding and remembering
detailed instructions; and had a marked impairment in social
functioning, there would not be any jobs in the national or
state-wide economies that the person could perform.

    *3.   The ALJ's Decision*

    After finding that Tavares was eligible for SSDI benefits
because she had been insured at the time of the alleged
disability, the ALJ concluded that Tavares was not disabled
within the meaning of the Act.  To reach this conclusion, the ALJ
undertook the requisite five-step sequential analysis.

    At step one, the ALJ found that Tavares had not engaged in
substantial gainful activity since November 30, 2006.  At step
two, the ALJ found that Tavares suffered from depression,
anxiety, post traumatic stress disorder, and neck pain secondary
to possible cervical spondylosis.  The ALJ classified these
impairments as "severe" under the Act because they caused Tavares
more than minimal functional limitations.  The ALJ found that
Tavares's gastritis, mild mitral regurgitation, alleged
tachycardia, history of hyperthyroidism/hyperthyroidism, and
obesity were not severe because they did not have any associated
complained-of functional limitations that were more than minimal.
Finally, the ALJ found that Tavares's claims of back pain,
osteoarthritis of the hands and knees, and fibromyalgia were

unsupported by objective clinical findings, and thus were not medically determinable impairments under the Act.

At step three, the ALJ found that Tavares did not have an impairment or combination of impairments that met or was equivalent to one of the listed impairments in the regulations. The ALJ found that the record failed to establish that Tavares's mental impairments caused at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation as defined in the regulations, thus Tavares's mental impairments were not medically equivalent to those listed in the regulations.

At step four, the ALJ found that Tavares had the RFC to perform light work with occasional climbing, stooping, crouching or crawling, and occasional reaching overhead. The ALJ found that Tavares had the ability to understand and remember simple instructions, to concentrate for two hour periods out of an eight hour day, to perform simple tasks, to interact appropriately with co-workers and supervisors, and to adapt to changes in the work setting. The ALJ found that these limitations would prevent Tavares from performing her past relevant work.

At step five, the ALJ looked to the Medical-Vocational Guidelines as a framework for whether Tavares would be considered disabled. Under part 404, subpart P, appendix 2 to title 20 of the Code of Federal Regulations, an individual of Tavares's age, functional restrictions, and education level, with an ability to

speak English, is not considered disabled, regardless of whether
the claimant has transferable job skills.  Soc. Sec. Ruling 82-
41.  The ALJ also found that there are jobs that exist in
significant numbers in the national economy that Tavares could
perform.  In making this determination, the ALJ evaluated
Tavares's age, RFC, education, work experience, and the testimony
of the VE.  Because the VE's testimony established that there
were a substantial number of jobs in the national economy that
Tavares could perform, the ALJ found that Tavares was not
disabled.

## II.   STATUTORY FRAMEWORK

A.   Standard of Review of an ALJ's Decision

The Social Security Act authorizes judicial review of social
security disability determinations.  42 U.S.C. § 405(g).  A
reviewing court is authorized to "enter, upon the pleadings and
transcript of the record, a judgment affirming, modifying, or
reversing the decision of the Commissioner of Social Security,
with or without remanding the cause for a rehearing."  *Id.*

The factual findings of the Commissioner must be treated as
conclusive if "supported by substantial evidence."  *Id.*  Review
is "limited to determining whether the ALJ used the proper legal
standards and found facts based on the proper quantum of
evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st
Cir. 2000).  "Substantial evidence" is "such relevant evidence as

a reasonable mind might accept as adequate to support a
conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).
Evidence is not insufficient under this standard merely because
contradictory evidence exists in the record. *Doyle v. Paul
Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998).

B.   Standard for Entitlement to SSDI and SSI Benefits

The underlying issue before me is whether Tavares is
"disabled" for purposes of the Social Security Act and is
therefore eligible for SSDI and SSI benefits.  A "disability" is
defined by the Act as an inability "to engage in any substantial
gainful activity by reason of any medically determinable physical
or mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period" of at least twelve months.  42 U.S.C. § 423(d)(2)(A)
(defining disability for SSDI); 42 U.S.C. § 1381c(a)(3)(A)
(defining disability for SSI).

An individual may only be considered disabled for purposes
of receiving benefits if her impairment is "of such severity that
[s]he is not only unable to do h[er] previous work but cannot,
considering h[er] age, education, and work experience, engage in
any other kind of substantial gainful work which exists in the
national economy."  42 U.S.C. §§ 423(d)(2)(A) (SSDI); 42 U.S.C. §
1381c (a)(3)(B) (SSI).

Under the relevant regulations, the Commissioner evaluates an individual's claim of disability under a five-step analysis. 20 C.F.R. §§ 404.1520(a), 416.920(a).  If the Commissioner determines that the claimant fails any of the five steps, he can find that the claimant is not disabled under the Act and need not continue the sequential analysis.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

At the first step, a claimant is not considered disabled if she is engaged in "substantial gainful activity."  *Id.*  At the second step, if the claimant does "not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that [are] severe and meets the duration requirement" the individual is not considered disabled.  *Id.*  At the third step, if a claimant's impairment meets or is equivalent to one specifically listed in the regulations and meets the duration requirement, the individual is deemed disabled.  *Id.*

At the fourth step, the claimant's residual functional capacity is determined, and if, given this determination, the claimant is capable of performing her past relevant work, she is not considered disabled.  *Id.*

The fifth step involves consideration of the claimant's residual functional capacity ("RFC") as well as age, education, and work experience to determine whether the claimant can make an

adjustment to other work.  If an adjustment can be made, the claimant is not considered disabled.  *Id.*

If at step four the claimant shows that she is unable to perform past relevant work, then at step five, in order to find the claimant not disabled, the Commissioner must come forward with evidence of the existence of specific jobs in the national economy that the claimant would be able to perform.  *See Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001).

### III.  DISCUSSION

Tavares claims that the Commissioner made three errors in evaluating her claim, and therefore his denial of SSDI and SSI should be reversed or remanded for further consideration.  First, Tavares claims that the ALJ erred by giving insufficient weight to Dr. Granot's treating source statement.  Second, Tavares claims that the ALJ selectively summarized the evidence to support his conclusion that Tavares was not disabled and excluded substantial evidence that Tavares was disabled.  Finally, Tavares claims that the ALJ's finding that she was not credible was not supported by substantial evidence.  Each claim will be addressed in turn.

A.   <u>Giving Insufficient Weight to Dr. Granot</u>

First, Tavares claims that the ALJ gave insufficient weight

to Dr. Granot's treating source statement.[3]   The ALJ declined to

give Dr. Granot's opinion controlling weight because he found Dr.

Granot's opinion to be inconsistent with the record as a whole

and also internally inconsistent.

Under First Circuit law, the ALJ was not required to give

greater weight to the opinion of Dr. Granot simply because he was

Tavares's treating psychiatrist.   *Arroyo v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991) (per curiam).

Indeed, the Social Security Administration has ruled that to do

so is error if the treating source's opinion "is not well-

supported by medically acceptable clinical and laboratory

techniques or if it is inconsistent with the other substantial

evidence in the case record."   Soc. Sec. Ruling 96-2p.

When an ALJ decides not to give a treating physician's

opinion controlling weight because it is inconsistent with other

substantial evidence in the record, the ALJ must nevertheless

weigh the opinion based on a number of factors listed in the

regulations.   20 C.F.R. § 404.1527(d).   Those factors include (1)

the length of the treatment relationship and the frequency of

---

[3]   Tavares also argues that more weight should have been given to
Crawford's two-years worth of notes, however as Tavares
recognizes, Crawford is not an acceptable medical source to whom
controlling weight may be given.   Soc. Sec. Ruling 06-03p.

examination; (2) the nature and extent of the treatment
relationship; (3) the medical evidence supporting the opinion;
(4) the opinion's consistency with the record as a whole; (5) the
physician's specialization in the medical conditions at issue;
and (6) other factors which tend to support or contradict the
opinion. 20 C.F.R § 404.1527(d).  Generally speaking, a treating
physician's opinion will be entitled to more weight than a
consulting physician's opinion.  *See* 20 C.F.R. § 404.1527(d)(2).

Here, the ALJ was entitled to find that Dr. Granot's
testimony conflicted with substantial evidence in the record.
Crawford and Dr. Granot completed a Psychiatric Review Technique
of Tavares on September 15, 2009.  In it, Dr. Granot opined that
Tavares had marked restrictions on her activities of daily
living; marked difficulty maintaining social functioning;
frequent deficiencies of concentration, persistence or pace
resulting in failure to complete tasks in a timely manner; and
repeated episodes of deterioration or decompensation.  Dr. Granot
also thought that Tavares's symptoms resulted in her complete
inability to function independently outside of her home.

On July 7, 2010, Dr. Granot co-signed a Medical Source
Statement for Tavares.  Dr. Granot concluded that Tavares was
markedly limited in her activities of a daily living; experienced
marked difficulties in maintaining social functioning; frequently
experienced deficiencies in concentration, persistence, or pace

resulting in failure to complete tasks in a timely manner; and had continual episodes of deterioration or decompensation in work or work-like settings.

Dr. Granot's two opinion statements were internally inconsistent and contradicted by a number of other reports in the record. For example, although Dr. Granot claimed that Tavares was markedly limited and experienced repeated and continual episodes of decompensation, Dr. Granot assigned her a GAF score of 58, which reflects only moderate symptoms. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000) ("Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).").  Dr. Granot's opinions conflict with those of Dr. McKenna, who found that on June 15, 2009 (a few months before Dr. Granot's Psychiatric Review Technique) that Tavares had only moderate restrictions on her activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  She also thought that Tavares was only moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based

27

symptoms; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public transportation. In all other respects, Dr. McKenna thought that Tavares was not significantly limited.

Crawford's notes also conflict, at least in part, with Dr. Granot's opinions. In late 2009 and into 2010, Crawford's records reveal that Tavares was improving in her ability to cope with her anxiety and depression, and was slowly able to partake in more social activities. For example, Tavares told Crawford that she was able to drive herself to the beach, go on long walks with her sister, engage in medical self-advocacy by going to the library to research her ailments, and follow up on appointments. She also reported feeling better with medication and coping skills she learned in therapy sessions. Tavares joined a gym, began babysitting her grandchildren, and expressed renewed interest in finding a support group and starting to work again. *Cf. Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995) ("Second, the record shows that Bentley not only tried to return to lighter work with his former company, but also applied for jobs both related and unrelated to his previous work during his claimed disability period. Again, this record of contemplating work indicates Bentley did not view his pain as disabling.").

Dr. Cherney's report also conflicts with Granot's opinions. In May 2009, Dr. Cherney observed that Tavares was depressed and

had difficulty interacting with others but also noted that
Tavares was able to complete all activities of daily living, and
gave her a GAF score of 52.  That GAF score indicates moderate
symptoms.  *Diagnostic and Statistical Manual of Mental Disorders*
34 (4th ed. 2000).  Dr. Cherney also thought that Tavares would
be able to handle her own benefits if they were awarded.

Substantial evidence in the record conflicted with Dr.
Granot's opinions, and it was within the discretion of the ALJ to
find that these conflicts undermined Dr. Granot's opinion,
because it is the ALJ's responsibility to resolve such conflicts
in the evidence.  *See Ortiz v. Sec'y of Health & Human Servs.*,
955 F.2d 765, 769 (1st Cir. 1991) ("[T]he resolution of conflicts
in the evidence is for the [Commissioner], not the courts.").
The ALJ's decision to give Dr. Granot's opinion less than
controlling weight because it conflicted with substantial
evidence in the record, itself was supported by substantial
evidence and was not error.

## B.   Selectively Summarizing the Evidence

Second, Tavares claims that the Commissioner selectively
summarized the evidence in the record to support his conclusion
that Tavares was not disabled.  While the ALJ's decision reflects
considerable editorial selectivity, the First Circuit has made it
clear that the question for review is only whether substantial
evidence supported the Commissioner's decision.  If it did, then

it is irrelevant that substantial evidence also could have supported the claimant's view. *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) ("Although other medical evidence in the record conflicted with Dr. Medina's conclusions, the resolution of such conflicts in the evidence is for the Secretary.  We must affirm the Secretary's resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence.").

Unlike the case that Tavares cites, *Bulpett v. Heckler*, 617 F. Supp. 850 (D. Mass. 1985), the ALJ did not selectively summarize portions, while omitting the overall character of, the reports in the record.  In *Bulpett*, the ALJ found that a claimant's impairments were not severe based primarily on three medical reports.  *Id.* at 854.  However, the ALJ mischaracterized the medical reports that he cited in substantial ways:

> For example, with respect to Bulpett's osteoarthritis and hypertension, the Administrative Law Judge states: "Despite her apparent osteoarthritis of the lumbosacral spine, [Dr. Aronson] found no evidence of nerve or disc disease. Her hypertension disclosed no end organ damange [sic] or severe symptomatology." (Tr. 68) In fact, Dr. Aronson's report states the following:
>
> > She has significant osteoarthritis involving the lumbosacral spine and apparently this is symptomatically important. There is no evidence of nerve root or disc disease, however. She also has hypertension which at the time of this one examination did not appear to be well controlled.

*Id.* at 855.

Here, the ALJ summarized the various reports and evaluations of the medical professionals, evaluated them *in toto*, and decided which were more credible.  Unlike the ALJ in *Bulpett*, the ALJ did not mischaracterize select reports to support a finding that Tavares was not disabled.  Instead, the ALJ painted a picture of a woman who was improving with medication, therapy, and treatment, as supported by Crawford's notes and Dr. McKenna's medical opinion.  That the ALJ found certain sources more credible than others was not error, because his decision was supported by substantial evidence in the record.

C.   Finding Tavares Not Entirely Credible

The ALJ found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  Tavares claims that the ALJ's holding that Tavares's testimony was not credible was not supported by substantial evidence and must be reversed.

Under the regulations, when an ALJ evaluates a claimant's subjective complaints, the ALJ should consider:

(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;

31

(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3).  If an ALJ determines that a claimant's testimony is not credible, the ALJ must support his decision to discredit her with substantial evidence.  *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987).

Here, the ALJ detailed the specific objective medical evidence, opinion evidence, and evidence of Tavares's daily activities that he credited and relied on which conflicted with Tavares's statements regarding her symptoms.  He recapitulated the medical opinion evidence, and explained why he credited Dr. McKenna's opinion over those of Dr. Collins-Wooley, Dr. Cherney, and Dr. Granot.  The ALJ found that Tavares's statements to Crawford and testimony before the ALJ showed a woman who was improving with medication and therapy and whose asserted limitations were inconsistent with the GAFs that were assigned to her and the record as a whole.  For example, the ALJ cited Tavares's testimony and statements both to Crawford and in her

32

application for SSDI/SSI that she was able to handle her
finances, drive a car, go food shopping, prepare her own meals,
do laundry, and clean her room; felt better on new depression
medication and stated that she was thinking about renewing her
real estate license and looking for work; joined a gym; and
babysat for her grandchildren.  Though Tavares's daily activities
do not, themselves, show an ability to work, they do support an
ALJ's adverse credibility finding.  *Teixeira v. Astrue*, 755 F.
Supp. 2d 340, 347 (D. Mass. 2010) ("While a claimant's
performance of household chores or the like ought not be equated
to an ability to participate effectively in the workforce,
evidence of daily activities can be used to support a negative
credibility finding." (citing *Berrios Lopez v. Sec'y of Health
and Human Servs.*, 951 F.2d 427, 429 (1st Cir. 1991))).

    As noted above, substantial evidence supported the ALJ's
decision to give more weight to the opinion of Dr. McKenna than
to other medical opinions.  Likewise, the ALJ's specific findings
show that his credibility determination was supported by
substantial evidence.  "The credibility determination by the ALJ,
who observed the claimant, evaluated [her] demeanor, and
considered how that testimony fit in with the rest of the
evidence, is entitled to deference, especially when supported by
specific findings.  *Frustaglia*, 829 F.2d at 195.[4]

---

[4]  Tavares has also offered a fourth reason why the ALJ's
decision should be reversed: that the ALJ failed to weigh all of

### IV.  CONCLUSION

For the reason set forth above, I AFFIRM the Commissioner's decision.


/s/ *Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

the evidence.  That argument is baseless.  The ALJ demonstrated throughout his written opinion that he considered the entire record in making his decision.  An ALJ is not required to state every single detail he gleaned from the record in his decision; all that is required is that he consider the entire record, and that his decision be supported by substantial evidence in the record as a whole.  Here, it is clear that the ALJ met his burden to evaluate the entire record.